## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **BOARD OF TRUSTEES OF THE** | } | |
| **UNIVERSITY OF ALABAMA, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.:  7:13-CV-1736-RDP** |
| | } | |
| **HOUNDSTOOTH MAFIA** | } | |
| **ENTERPRISES LLC et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

The phrase "a day late and a dollar short" has served as the theme of songs, books, poems, movies, and television shows.  As explained below, it is a theme that also characterizes the respective approaches taken in this case by (1) Michelle K. Lee ("Lee"), the Undersecretary for Intellectual Property and Director of the United States Patent and Trademark Office ("USPTO") and the USPTO's Trademark Trial and Appeal Board ("TTAB"), and (2) Defendants Houndstooth Mafia Enterprises, LLC, Christopher Blackburn, and William Pitts, Jr.

Lee has moved to intervene in this action indicating that she seeks to protect the interests of the USPTO.  The USPTO says that its asserted interest is to avoid the unnecessary vacatur of one of its precedential decisions.  The decision at issue was rendered by the TTAB and was favorable to Houndstooth Mafia, Christopher Blackburn, and William Pitts, Jr. ("Defendants" in this case) and unfavorable to the Board of Trustees of the University of Alabama and Paul Bryant, Jr. ("Plaintiffs" in this case).  After the TTAB's ruling, in September 2013, Plaintiffs filed this action appealing that decision. While this action was pending in this court, Plaintiffs and Defendants reached a settlement of the matter.  Importantly, as part of that settlement, the

parties agreed to the vacatur of the TTAB's administrative decision.  Defendants have explained that their primary reason for settling was financial—they were a dollar short in defending the appeal.

In May 2014, the parties submitted and the court approved the settlement and entered a Final Consent Judgment. (Doc. # 15).  Among other things, the Final Consent Judgment called for the vacatur of the TTAB's decision which was favorable to Defendants.  (Doc. # 15).  After the court entered final judgment, the parties submitted it to the TTAB.  No action was taken. More than a year passed.

Finally, in June 2015, the TTAB essentially (and inexplicably) treated the court's Order as a request, and issued a decision refusing to comply with this court's Order. (Doc. # 30-2). Thereafter, Plaintiffs moved to enforce this court's prior final judgment.  (Doc. # 16).  In light of those developments, this court scheduled a hearing, and invited the USPTO to participate. Through its counsel, the USPTO appeared at the hearing.  It was only after the hearing that Lee sought to intervene − she is more than a day late.

This matter is before the court on (1) Plaintiffs' Motion to Enforce Consent Judgment (Doc. # 16), filed July 23. 2015, and (2) the Motion by Michelle K. Lee, Undersecretary for Intellectual Property and Director of the United States Patent and Trademark Office, to Intervene (Doc. # 28), filed September 17, 2015.  These matters have been fully briefed, and the court has heard argument on the Motion to Enforce Consent Judgment.  (Docs. # 20, 21, 22, 26, 27, 30, 31).  After careful consideration, and with the benefit of that oral argument, the court concludes that the motion to intervene is due to be denied as untimely, and the motion to enforce the judgment is due to be granted.

## I.      Background

In July 2013, after five years of administrative discovery and depositions, the TTAB issued a decision dismissing an opposition filed by Plaintiffs against the registration of the HOUNDSTOOTH MAFIA mark sought by Defendants, Pitts and Blackburn.  (Docs. # 16-4 at 3, 22 at 4).  The University has licensed the Houndstooth pattern as a trademark in connection with various goods because it contends the pattern is well-known to be associated with the University.  (*See, e.g.,* Doc. # 22 at 13−14).  The TTAB decision held that Defendants could proceed to registration on the HOUNDSTOOTH MAFIA mark.  (Doc. # 1; Doc. # 16-1).

Section 107 of the Lanham Act permits a litigant to appeal a TTAB ruling directly to the Federal Circuit, 15 U.S.C. § 1071(a)(1).  In the alternative, a party may file a civil action challenging the board's ruling in a federal district court, 15 U.S.C. § 1071(b)(1).  Dissatisfied with the TTAB's decision, the University and Bryant elected the latter option and filed suit in this court.  (Doc. # 1).

During the course of this litigation, the parties reached a settlement.  Pursuant to that settlement, they presented to the court a Final Judgment of Consent.  (Doc. # 14).  As part of the settlement, Pitts and Blackburn assigned to the University all right, title, and interest in and to the Houndstooth Mafia mark that was the subject of the TTAB decision.  (Doc. # 14-1 at 3).  In addition, pursuant to the settlement all parties acknowledged and agreed that the TTAB's decision favorable to Pitts and Blackburn should be vacated.  (*Id.*).  The court approved the parties' settlement, and entered Final Consent Judgment on May 27, 2014.  (Doc. # 15).  As part of that judgment, and due to the parties' express settlement terms, the court ordered that the TTAB's decision "is **VACATED**."  (Doc # 15 at 3 (bold and caps in original)).

It is important to understand the parties' respective reasons for reaching their settlement. Defendants pursued a settlement because they "wanted to get what they could," and their attorneys "couldn't afford to do free work on an appeal as they had on a hearing before the TTAB." (Doc. # 26 at 7). Plaintiffs were amenable to settlement with one non-negotiable condition: they required with respect to any resolution of the dispute. They were only willing to settle if the TTAB's 2013 decision was vacated. Plaintiffs insisted on this condition because they are repeat players[1] before the TTAB, and were concerned with the precedential effect of the TTAB's 2013 decision. (Doc. # 30-1, 30-4, 30-5). Thus, Plaintiffs made it clear that there would be no settlement unless the parties agreed to vacatur of the TTAB's unfavorable (and, in Plaintiffs' view, incorrect) decision as part of a resolution.

On September 15, 2014, after the court entered its Final Consent Judgment, which vacated the TTAB's July 2013 decision, Plaintiffs filed (what they surely believed would be) a *pro forma* motion to reopen the administrative action, vacate the TTAB's decision, and dismiss the action with prejudice. (Doc. # 16-3). Plaintiffs attached a copy of this court's Final Consent Judgment. (Doc. # 16-3, Ex. 2). But the TTAB took no action. It did not vacate its decision. In fact, for a substantial period of time -- that is, until June 2015 (when it issued an opinion purporting to deny Plaintiffs' motion) -- it took no action at all on Plaintiff's motion or upon this court's final judgment.

The TTAB has acknowledged that it monitors litigation such as the proceedings in this case. (Doc. # 33 at 5). But despite that monitoring, and even after actually receiving this court's

---

[1] This repeat-player concern presents a rather interesting angle in this case. The University is facing at least one other agency proceeding in the TTAB (the *Diaz* proceeding). The University is concerned that the TTAB's belated decision to refuse to vacate its precedential decision involving Houndstooth Mafia will prejudice it in the *Diaz* proceeding which is still to be tried before the TTAB. The University also seems concerned that although there has been a "frequency with which the Board has received similar post-decisioned requests" (Doc. # 16-4, at 2-3), the TTAB has chosen this case to mount a challenge to such settlement provisions.

Final Consent Judgment (Doc. # 15), the TTAB did not vacate its decision.  Nor, at that time, did it seek to intervene and ask this court to reconsider its ruling.  There was no appeal taken to the Eleventh Circuit.  Instead, more than a year later (and after mulling over whether it would comply with the court's Final Consent Judgment), on June 23, 2015, the TTAB made its own "decision" not to comply with the parties' agreement and this court's express order contained in the Final Consent Judgment.  (Doc. # 30-2).

After the TTAB entered its June 2015 decision, the University and Bryant filed their motion to enforce.  (Doc. # 16).  After receiving a response to that motion, the court set this case for a hearing.  (Docs. #17, 18).  Lee did not seek to intervene then.  Nevertheless, the court "invited" counsel for the USPTO to submit briefing and participate in the scheduled hearing.  (Doc. # 17).  It was only some time after the court concluded its hearing on the motion (*see* Doc. # 22) that Lee belatedly filed her motion to intervene.  (Doc. # 28).

## II.    Standard of Review

Section 21 of the Lanham Act permits a party dissatisfied with a TTAB decision to either appeal directly to the Federal Circuit or bring a civil action in a federal district court. 15 U.S.C. § 1071(a), (b); *see also Material Supply Int'l, Inc. v. Sunmatch Indus. Co., Ltd*., 146 F.3d 983, 989 (D.C. Cir. 1998).  "A challenge to the TTAB's decision in a district court is 'both an appeal and a new action, which allows the parties to request additional relief and to submit new evidence.'" *Board of Regents of University of Wisconsin System v. Phoenix Intern. Software, Inc.*, 653 F.3d 448, 452 (7th Cir. 2011) (quoting *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673 (7th Cir. 2001)). "In such an action, the district court wears two hats: '[it] is an appellate reviewer of facts found by the TTAB and is also a fact-finder,'" provided that new evidence is introduced to the court.  *Id*. (quoting *CAE, Inc.*, 267 F.3d at 674).

Acting in this dual capacity, a district court applies a standard of review that is a hybrid of deferential treatment and *de novo* scrutiny. *Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*, 517 F. Supp. 2d 1, 3−4 (D. D.C. 2007).  Deferential treatment is granted to the TTAB's finding of facts, but "because 'the district court is just as able as the TTAB to determine an issue of law,' review of legal questions is de novo." *Id.* (citing *Mitchell Cosmetics SARL v. Pramil S.R.L. (Esapharma)*, 2005 WL 3273371, *2 (D. D.C. 2005)).

When a party seeks intervention as a matter of right under Federal Rule of Civil Procedure 24(a)(2), she is required to (1) file a timely application for intervention, (2) show an interest in the subject matter of the action and that disposition of the action without intervention would, as a practical matter, impair or impede her ability to protect that interest, and (3) establish that her interest was not adequately represented by the existing parties.  *United States v. U.S. Steel Corp.*, 548 F.2d 1232, 1235 (5th Cir. 1977)[2] (citing Fed. R. Civ. P. 24(a)(2); *United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826, 841 (5th Cir. 1975)).  "The question of timeliness lies within the district court's discretion, which may be reversed only upon a showing of abuse:  timeliness is not limited to chronological considerations, it 'is to be determined from all the circumstances.'"  *U.S. Steel*, 548 F.2d at 1235 (citing *NAACP v. New York*, 413 U.S. 345, 366, 93 S.Ct. 2591, 2603 (1973)).  Intervention attempts after final judgments are '"ordinarily looked upon with a jaundiced eye.'"  *Id.* (quoting *McDonald v. E. J. Lavino Co.*, 430 F.2d 1065, 1072 (5th Cir. 1970)).  This is because "[i]nterventions after judgment have a strong tendency to prejudice existing parties to the litigation or to interfere substantially with the orderly process of the court."  *Id.*

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

### III.    Analysis

The USPTO raises two issues that must be addressed by the court.  First, it argues that it was not required to vacate its 2013 decision in compliance with the Order because "the parties did not have the right to agree among themselves that the Board's precedential decision should be vacated … ."[3]  (Doc. # 20 at 2).  Second, the court must determine whether Lee's motion to intervene is timely.  The court addresses each of these questions in turn.

### A.    Plaintiffs' Motion to Enforce Consent Judgment

Plaintiffs have moved to enforce the Final Consent Judgment and challenge the USPTO's decision to ignore this court's order to vacate the TTAB's prior unfavorable ruling.  The USPTO contends that *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18 (1994), stands for the proposition that this court was without power to vacate the TTAB decision based merely on the parties' settlement.  However, this argument misses the mark for at least two reasons.  As discussed below (in Section III(B) of this opinion), the argument should have been made (if at all) after a timely motion to intervene followed by either (1) a request to modify the court's order and/or (2) an appeal to the Eleventh Circuit (the court that reviews this court).  As noted already (and again discussed more fully below), the USPTO did not timely seek to intervene, filed no motion to modify (or reconsider), and took no such appeal.  But even putting aside the untimeliness of the motion to intervene and addressing the merits of the USPTO's argument, *U.S. Bancorp* does not control here.  Rather, this case is more closely aligned with *Major League Baseball Properties, Inc. v. Pacific Trading Cards, Inc.*, 150 F.3d 149 (2nd Cir. 1998).

---

[3] At another point in its briefing, the USPTO says that it seeks to prevent the unnecessary vacatur of its "judicial decision[]. (Doc. # 33 at 12).  This argument betrays a misunderstanding (or worse) of the process of appellate review of the TTAB's decisions.  The court addresses that subject in more detail below.

1.     **The USPTO Does Not Have the Authority to Ignore a Reviewing Court's Order.**

When this court issued the Order, it was, for all practical purposes, acting as a court of appellate jurisdiction over the TTAB.[4]

> The [district] court [reviewing an inter partes TTAB decision] may adjudge [1] that an applicant is entitled to a registration upon the application involved, [2] that a registration involved should be canceled, or [3] *such other matter as the issues in the proceeding require*, as the facts in the case may appear.

15 U.S.C. § 1071(b)(1) (emphasis added); *see also* 28 U.S.C. § 2106 ("The Supreme Court *or any other court of appellate jurisdiction* may affirm, modify, *vacate*, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.") (emphasis added).  Although the language of Section 2106 "applies in terms only to review of a court order, its basic principle is not inapposite to appellate review of agency orders."  *Greater Boston Television Corp. v. F.C.C.*, 463 F.2d 268, 277 (D.C. Cir. 1972); *see Environmental Defense Fund, Inc. v. Costle*, 578 F.2d 337, 346 n. 33 (D.C. Cir. 1978) ("Although 28 U.S.C. § 2106 in terms applies to review of court

---

[4] The TTAB acknowledges that "we are not an appellate court." (Doc. # 16-4 at 12). In fact, the TTAB is not a court at all.  It is an administrative body within the United States Patent and Trademark Office (USPTO) responsible for hearing and deciding only certain kinds of matters involving trademarks. Administrative Law Judges of the TTAB are appointed by the United States Secretary of Commerce in consultation with the Director of the USPTO.  According to the USPTO, the TTAB:

> is a neutral body that <u>functions like a court</u> for trademark matters at the USPTO.  The Board's administrative trademark judges are authorized to determine a party's right to register a trademark with the federal government.  The Board is not authorized to determine whether you have the right to use a trademark, just whether you have the right to register it. Additionally, the Board is not authorized to determine questions of trademark infringement or unfair competition or to award money damages or attorney's fees. For anything other than determining the right of federal registration, you must file a case in federal or state court.

http://www.uspto.gov/trademark/laws-regulations/trademark-trial-and-appeal-board , last accessed on February 18, 2016 (emphasis added).

orders, it has been understood to identify a general principle of appellate review that is applicable to review of agency orders and regulations … .").

"Administrative agencies [] are not free to ignore [a] court's mandates. This 'mandate rule' is sometimes described as part of the inaptly-named 'law of the case doctrine.'" *Youghiogheny & Ohio Coal Co. v. Milliken*, 200 F.3d 942, 950 (6th Cir. 1999) (citing 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4478, at 788–93 (1st ed. 1981 & Supp.1999) and *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998) (noting that the doctrine applies to judicial review of administrative decisions)).   In this sense, the TTAB, an administrative body, is no different than a lower court which is reviewed by an appellate court.   "The mandate rule is a 'specific application of the "law of the case doctrine" requiring that '[a] trial court, upon receiving the mandate of an appellate court, may not alter, amend, or examine the mandate, or give any further relief or review, but must enter an order in strict compliance with the mandate.'" *Norelus v. Denny's, Inc*., 628 F.3d 1270, 1288 (11th Cir. 2010) (quoting *Piambino v. Bailey*, 757 F.2d 1112, 1119−20 (11th Cir. 1985)).   Thus, the mandate rule requires the TTAB to follow, rather than reexamine (or worse, ignore), this court's final judgment.

When a lower court is subject to appellate review, it "is not free to deviate from the appellate court's mandate." *Wheeler v. City of Pleasant Grove*, 746 F.2d 1437, 1440 n. 2 (11th Cir. 1984). "A district court when acting under an appellate court's mandate, 'cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon a matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded.'"  *Litman v. Mass. Mut. Life Ins. Co*., 825 F.2d 1506, 1510−11 (11th Cir. 1987) (quoting *In re Sanford Fork & Tool Co*., 160 U.S. 247, 255 (1895)).

"'Although the trial court is free to address, as a matter of first impression, those issues not disposed of on appeal, it is bound to follow the appellate court's holdings, both expressed and implied.'" *Piambino*, 757 F.2d at 1119 (internal citations omitted).  If an Article III court is so bound by an appellate court's decision, it follows that an administrative body (like the TTAB) is similarly constrained by a district court's decision made while that court is acting as an appellate court reviewing a decision of the TTAB.[5]

### 2. The USPTO's Position is Wrong on the Merits; This is Not Merely a Case of Mootness by Settlement.

In addition to not having the <u>authority</u> to ignore this court's final judgment, the TTAB's <u>reason</u> for refusing to vacate its decision is also erroneous.  The principle argument offered by the TTAB is that, under *U.S. Bancorp*, its "precedential" decision does not become moot based on the parties' settlement of the action.  But the TTAB misapplies the Supreme Court's decision in *U.S. Bancorp*.  It also flatly mischaracterizes the facts of that case.

In *U.S. Bancorp*, unlike the situation here, the settlement did not involve a provision in which the parties agreed to vacate a lower court decision.  To the contrary, the creditor (U.S. Bancorp Mortgage Co.) made a request to vacate, but the debtor (Bonner Mall Partnership) opposed it.  Indeed, the Court's own discussion of the proceedings in *U.S. Bancorp* makes this fact clear:

> Bancorp then petitioned for a writ of certiorari.  After we granted the petition, 510 U.S. 1039 (1994), and received briefing on the merits, Bancorp and Bonner stipulated to a consensual plan of reorganization, which received the approval of the Bankruptcy Court. The parties agreed that confirmation of the plan constituted a settlement that mooted the case. Bancorp, however, also requested that we

---

[5] Curiously, however, the TTAB refuses to accept the concomitant responsibility placed upon courts to obey the orders of a "reviewing court."  Section 1071(b)(1) contemplates that district courts may review the TTAB's decisions; therefore, the principles of Section 2106 are relevant to such review.  And, without question, the principles that can be extrapolated from Section 2106 require the TTAB's compliance with this court's "appellate" Order.  When a Section 1071(b)(1) reversal or remand occurs, the TTAB does not thereafter sit as an independent arbiter of whether a reviewing court got it right.

> exercise our power under 28 U.S.C. § 2106 to vacate the judgment of the Court of
> Appeals. Bonner opposed the motion. We set the vacatur question for briefing and
> argument. 511 U.S. 1002−1003 (1994).

*Id*. at 20.  Indeed, there was no provision in the *U.S. Bancorp* settlement where the parties agreed

to ask the Court to vacate the circuit court's decision.  Thus, the question the Supreme Court

actually faced in *U.S. Bancorp* was this:  Is the mere settlement of a case on appeal (or certiorari

review) grounds, in and of itself, enough for a reviewing court to vacate the civil judgment of a

subordinate court?  *Id*. at 19.

To be clear, that is <u>not</u> the question presented here.  In this case, the parties expressly

agreed, as part of their settlement, that the TTAB's decision below would be vacated.  Thus, the

court's decision in *U.S. Bancorp* is not instructive (much less controlling) here.[6]  Rather, the

circumstances here closely mirror those presented to the Second Circuit in *Major League*

*Baseball Properties*, a case that analyzed *U.S. Bancorp* but correctly concluded it did not control.

In *Major League Baseball Properties*, suit was filed over Pacific Trading Cards' alleged

trademark violations.  MLB Properties moved for an injunction in the district court, but the

district judge denied the motion, finding in part that MLB Properties was not likely to succeed on

the merits of its action.  MLB Properties appealed to the Second Circuit.  While the appeal was

pending the parties reached a settlement.  Part of that settlement involved the parties' joint

request that the Second Circuit vacate the district court's order and opinion "so that they could

settle their dispute."  150 F.3d at 150.  The Second Circuit granted that request.  Its explanation

for doing so is equally applicable here.

---

[6] In this court's view, the facts presented in *Major League Baseball Properties* (and here) are distinguishable from those in *U.S. Bancorp*.  In all fairness, the Second Circuit's approach was not so much to distinguish *U.S. Bancorp* as it was to explain why the facts before it fell into what the Supreme Court recognized in *U.S. Bancorp* as "exceptional circumstances" that could lead to vacatur of a lower court decision after a settlement. At least in the context of this case, the TTAB's decision is due to be vacated under either rationale.

[] Pacific strongly desired a settlement to avoid [specific] financial consequences of [defending the appeal].

MLB was agreeable to a settlement but needed a vacatur because, in the course of defending its marks, it … had to be concerned about the effect of the district court's decision in future litigation with alleged infringers.  Under trademark law, MLB must defend its mark against all users or be subject to the defense of acquiescence.  *See* 15 U.S.C. §§ 1069, 1115(b)(8); *McLean v. Fleming*, 96 U.S. 245, 257–58, 24 L.Ed. 828 (1877); *Bourne Co. v. Tower Records, Inc.*, 976 F.2d 99, 102 (2d Cir. 1992); *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1042 (2d Cir. 1980).

The parties were thus locked in a dispute that they could end on a commercial basis satisfactory to both.  However, a vacatur of the district court's order and opinion was a necessary condition of settlement.  Unlike *Bancorp*, therefore, the victor in the district court wanted a settlement as much as, or more than, the loser did.  MLB, by law, had to continue to test the merits of the district court's opinion or risk its marks if it could not obtain a vacatur.  The only damage to the public interest from such a vacatur would be that the validity of MLB's marks would be left to future litigation.  In our view, these facts met the "exceptional circumstances" test of *Bancorp*.

We therefore vacated as moot the district court's decision and dismissed MLB's motions for an injunction pending appeal and for an expedited appeal.

*Major League Baseball Properties*, 150 F.3d at 152.  The *Major League Baseball Properties* decision cuts directly against the USPTO's position here.  Quite understandably, Lee argues that *Major League Baseball Properties* is distinguishable on a number of grounds.  (Doc. # 32).  The court disagrees.

The TTAB first argues that *Major League Baseball Properties* is distinguishable because it is based on an application of 28 U.S.C. § 2106 which, it says, does not apply here.  But, as discussed above, Section 2106's principles are at least instructive in appellate review of agency orders. *Greater Boston Television Corp.*, 463 F.2d at 277; *Environmental Defense Fund, Inc.*, 578 F.2d at 346 n. 33.  And those principles are certainly consistent with this court's role as a reviewing court under Section 1071(b)(1).

The TTAB also argues that *Major League Baseball Properties* is distinguishable because it vacated a non-final, non-binding, interlocutory order, and that its 2013 decision cannot be vacated because it has designated it as "precedential."   Again, this is a distinction without a difference.   In *Major League Baseball Properties*, the order vacated was that of an Article III court.   Here, the TTAB's opinion, which this court ordered vacated, is an administrative ruling which the agency itself has self-designated as precedential.   Such an agency decision holds no more legal weight than an Article III court's decision,[7] such as the one in *Major League Baseball Properties.*   Indeed, any suggestion to the contrary is simply odd.

Next, the TTAB argues that Pacific Trading Cards faced a "Hobson's choice" between defending the appeal and facing financial ruin, and that this extraordinary circumstance was not present in the case before this court.   This argument is like bad plumbing:  it simply does not hold water.   Houndstooth Mafia and its owners have represented that they could not afford to defend against the appeal in this court.   But that is exactly what they would have been required to do, absent a settlement.   (Doc. # 26 at 7) (noting that Houndstooth Mafia, Pitts, and Blackburn

---

[7] Undeniably, "the well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort to guidance." *U.S. v. Mead Corp.*, 533 U.S. 218, 227 (2001) (internal citations omitted).   And precedent – as a general concept – serves to promote "the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Kimble v. Marvel Entertainment, LLC*, 135 S. Ct. 2401, 2409 (June 22, 2015).   We are not dealing here with judicial precedents.   The Supreme Court has recognized that stare decisis in the administrative process may have a more qualified role, *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, 89 S.Ct. 1426, 1430 (1969), although subsequent decisions and authors have recognized the advantages of administrative agency precedent.   This court does not question the fact that agencies have the authority to make certain of their decisions precedential. (Doc. #20 at 10-11).   But as explained at length *supra*, the USPTO lacks the authority to rely on its precedent to justify ignoring a decision of a reviewing court.   15 U.S.C. § 1071(b)(1).

An analogy illustrates the fallacy of the TTAB's position.   Suppose that by local rule, all of the judges in a particular district court had agreed to treat (at least within the district) each of the district judges' decisions as precedential, in order to aid in uniform judicial decision-making within the district.   (Admittedly, this portion of the analogy is a "stretch" but the analogy serves to make the point).   Suppose further that a judge in that district receives a remand order from the federal court of appeals.   The order vacates the district court's earlier decision.   When faced with the circuit court order to vacate, the district judge mulls it over a year, and finally announces that the court of appeals was without authority to vacate her order.   At a minimum, such determination by a district court would provoke an interesting response from the court of appeals.

desired a settlement of the appeal to this court because they "wanted to get what they could," and their attorneys "couldn't afford to do free work on an appeal as they had on a hearing before the TTAB.").   Just like Pacific Trading Cards in *Major League Baseball Properties*, Defendants were locked in a dispute that they could not afford to continue litigating and wished to settle. The dispute could end on a "commercial basis satisfactory to both."   *Major League Baseball Properties*, 150 F.3d at 152.   But vacatur of the decision appealed from was a non-negotiable necessary condition to that settlement.   *Id*.   Thus, Houndstooth Mafia faced a similar Hobson's choice.

Finally, the TTAB argues that *Major League Baseball Properties* is distinguishable because, in that case, it was the court (rather than the parties) that initially suggested mediation, (and did so only after indicating that it intended to require Pacific Trading Cards to post a bond pending appeal). As discussed above, Houndstooth Mafia, Pitts, and Blackburn (just like the defendant/appellee in *Major League Baseball Properties*) also faced a financial predicament and they desired to settle this matter because of that predicament.   The fact that in *Major League Baseball Properties* it was the court which first raised the idea of mediation is of no moment.   In both cases, the parties examined their options and discussed settlement.   One party needed a settlement for financial reasons, and the other was willing to settle, but unable to do so unless the order appealed from was vacated.   Thus, the circumstances here are precisely the same "exceptional circumstances" that were present in *Major League Baseball Properties*.   And those exceptional circumstances justify the application of the *Major League Baseball Properties* equitable exception here.

Another instructive case is *Motta v. District Director of INS*, 61 F.3d 117 (1st Cir. 1995), a case discussed by the Second Circuit in its *Major League Baseball Properties* decision.   In

*Motta*, the First Circuit vacated a lower court's decision on the ground that "exceptional circumstances" tipped the equitable balance in favor of vacatur. *Id*. at 118–19. The INS had appealed from a judgment of the district court which stayed a deportation pending a decision on a motion to reopen the deportation proceedings. *Id*. at 117–18. The First Circuit encouraged the INS to resolve the case because it was in the interest of all parties. However, the INS (like MLB Properties and Plaintiffs here) believed that it could not settle without vacatur of the lower court's decision given that it was a "repeat player before the courts" and could not relinquish its right to appeal a decision that might harm it in future litigation. *Id*. at 118.

The First Circuit concluded that these circumstances were exceptional. Similar to the Second Circuit's conclusion in *Major League Baseball Properties*, the interest in settlement outweighed the social value of the precedent being vacated. *Id.* Here, too, the University and Bryant are repeat players before the TTAB. *See infra* n. 1. Plaintiffs found themselves in a position where an opponent wished to settle but Plaintiffs could not agree to a resolution absent vacatur of the decision under review. (Doc. # 24). As in *Major League Baseball Properties* and *Motta*, the exceptional circumstances of this case justify the unique requirement of vacatur agreed to by the parties.

The TTAB also asserts that it was not required to comply with this court's Order because the court's docket did not reflect that the court had examined the entire factual record developed before the TTAB. This argument might have some traction if the court's Final Consent Judgment had actually re-examined the TTAB's factual findings or did something more than enter judgment based upon the parties' express settlement. However, the Order did no such thing. This was not a decision on the merits.[8]

---

[8] To be sure, while the court did not engage in any rigorous factual or legal analysis, the court was admittedly perplexed by the TTAB's ruling.

The TTAB further asserts that its refusal to comply with this court's final judgment is justified because it has not been presented with any legal authority that would allow this court to vacate a TTAB decision under the circumstances of this case.[9]   At its best, this is a strange argument.  It is far wide of the mark not only for the reasons already discussed, but also because it reflects a fundamental misunderstanding (or perhaps a tortured reading) of 15 U.S.C. § 1071(b).  Section 1071(b) provides:

> The [district] court [reviewing an inter partes TTAB decision] may adjudge [1] that an applicant is entitled to a registration upon the application involved, [2] that a registration involved should be canceled, or [3] *such other matter as the issues in the proceeding require*, as the facts in the case may appear.

15 U.S.C. § 1071(b)(1) (emphasis and brackets added).  The TTAB did not comply with this court's Final Consent Judgment, ostensibly because *it* determined after *its* own review that the record *before this court* did not reveal information justifying the application of the third subsection of Section 1071(b).

Again, the TTAB simply misapprehends its position in relation to a district court's appellate review pursuant to Section 1071(b).  First, under Section 1071(b), district courts review the TTAB's decisions, not the other way around.  The TTAB's misunderstanding is perhaps best

---

"THE COURT:  Let me ask you this, and I'm going to do this in two parts.
Jason [the AUSA serving as local counsel], how long have you been in Alabama?
MR. CHEEK:  A year and a couple months, Your Honor.
THE COURT:  That may be long enough.  What was Bear Bryant's signature apparel item?
MR. CHEEK:  It was a houndstooth fedora.
THE COURT:  If you're walking down the street in Alabama and see somebody with something on that's houndstooth, do you say I wonder if that's an Auburn fan?
MR. CHEEK:  Usually no, Your Honor.
THE COURT:  Do you say I wonder if they just like houndstooth.  That's really out of fashion these days. I don't see a whole lot of people wearing houndstooth maybe except at Alabama tailgate parties.
MR. CHEEK:  Usually.

(*See* Transcript of Hearing, Doc. 22 at 13−14, Lines 13:19−14:9).  Again, as noted above, the court based its Final Consent Judgment solely on the terms of the parties' settlement, not the merits of the underlying claim.  But it did find the TTAB's decision curious.

[9] Apparently, the TTAB on remand determined that this court could not have relied on the "such other matter as the issues in the proceeding require" because this court did not receive a copy of the administrative record.

illustrated by the fact that, at least twice during the August 20, 2015 hearing before the court, counsel for the TTAB referred to the Order (*i.e.*, this court's Final Consent Judgment) as a "piece of paper."  (Doc. # 22 at 6, 11).  To be crystal clear—the court's Final Consent Judgment is not merely a "piece of paper"; it is an order of a court sitting in appellate review (pursuant to 15 U.S.C. § 1071(b)) over a decision of the TTAB.  "Administrative agencies [] are not free to ignore [a] court's mandate[]."  *Youghiogheny & Ohio Coal Co.*, 200 F.3d at 950.  "Appellate" court orders are not merely "pieces of paper" that a court (much less an Article II administrative agency) may choose to disregard, even after taking a substantial period of time to mull it over.  Disagreement with an appellate court's order (or its rationale) does not justify non-compliance.[10]  And the TTAB's decision is even more problematic because it has simply misread (or, worse, misstated) Supreme Court authority as its basis for inaction.

For all of these reasons, the court concludes that Plaintiffs' Motion to Enforce Consent Judgment (Doc. # 16) is due to be granted.

### B.    Motion by Michelle K. Lee, Undersecretary for Intellectual Property and Director of the United States Patent and Trademark Office, to Intervene

The University and Bryant appealed the TTAB's 2013 decision to this court on September 19, 2013.  (Doc. # 1).  On May 27, 2014, the court entered its Final Consent Judgment.  (Doc. # 15).  That final judgment acknowledged that the parties had fully resolved

---

[10] Under the All–Writs Act, federal courts have authority to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651; *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC*, 523 F. Supp. 2d 328, 335 (S.D.N.Y. 2007). "[I]njunctions [under the All–Writs Act] are needed to prevent third parties from thwarting the court's ability to reach and resolve the merits of the federal suit before it." *In re Baldwin–United Corp.*, 770 F.2d 328, 339 (2d Cir. 1985). If a court finds an injunction "necessary and appropriate," the All–Writs Act empowers the court "to enjoin and bind non-parties to an action when needed to preserve the court's ability to reach or enforce its decision in a case over which it has proper jurisdiction." *Id.* at 338 (citing *United States v. New York Telephone Co.*, 434 U.S. 159, 174 (1977) ("The power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice.")).

their differences; it also operated to close this case.  And it ordered, consistent with the express terms of the parties' settlement, that TTAB's decision be vacated.

On June 3, 2015, Plaintiffs filed with the TTAB a Request to Reopen, Vacate and Dismiss Without Prejudice.  (Doc. # 30-1 at ¶ 2).  Nothing occurred for three months. Consequently, Plaintiffs filed a gentle reminder in the form of a Notice of Filing.  (*Id.* at ¶ 3). Again, nothing happened.  It was not until June 23, 2015, a year after the USPTO, the TTAB, and Lee received notice of the final judgment, that the TTAB ruled, and denied Plaintiffs' "request."  So, after deliberating over a year, the TTAB said (in essence), "we don't have to follow your order – we don't have to vacate our decision."

Plaintiffs challenge Lee's Motion to Intervene as untimely.  In response, the USPTO asserts that, as a non-party, it had no way of knowing that its "interests" were affected by this court's Final Judgment until the court explained its views during the hearing on August 20, 2015. (Doc. # 33 at 6).  That argument is not only incredible, but also made in bad faith.  The USPTO was on notice, no later than June 3, 2014 (when Plaintiffs filed their request to vacate and attached this court's Final Consent Judgment), that this court, had pursuant to the parties' express settlement terms, ordered vacatur of the TTAB's decision.[11]  (*See* Doc. # 30-1).

To the extent the TTAB disagreed with the settlement's terms or the Final Consent Judgment's requirements, and wished to challenge those requirements, it was required to intervene in this action.  But how did the Director, USPTO, and TTAB respond to the parties'

---

[11] The USPTO asserts that even as of June 3, 2014, it had no way of knowing its interests would be affected because the TTAB still had to consider whether to vacate its 2013 decision (read:  our interests aren't affected by the district court's order until we say our interests are so affected).  The argument drips with self-importance. Moreover, it runs contrary to the USPTO's own representations.  In its Reply in Support of its Motion to Intervene, the TTAB has represented that the "Director monitors developments in these cases to ensure that [] the TTAB's decision is being defended."  (Doc. # 33 at 5).  As the Director was monitoring this case to ensure the TTAB's decision was being defended, she and the USPTO knew (or should have known) as of at least May 27, 2014, that they had an interest in this case.  But even in the absence of such monitoring, at least by June 3, 2014, when it received Plaintiffs' request to vacate, the USPTO knew this court had ordered vacatur of the TTAB's decision.

agreement and the court's Final Consent Judgment?  Did they seek to intervene,[12] or ask this court to reconsider[13] its Final Judgment, or give notice of an appeal?[14]  No.  Quite to the contrary.  Rather than timely act, after more than a year of mulling over the Final Consent Judgment, on June 23, 2015, the TTAB issued its own ruling refusing to comply with the Order.  (Doc. # 16-4).  That led Plaintiffs, on July 23, 2015, to move to enforce the Final Consent Judgment.  (Doc. # 16).  And it was not until September 17, 2015 (after a hearing on the motion to enforce took place), that the Director filed her motion to intervene in this long-since-closed action.  (Doc. # 28).  The University and Bryant oppose the motion and argue that it is untimely.  (Doc. # 30).  The court agrees.[15]  Lee's motion is untimely.

As already noted, in deciding an issue of timeliness, a court must consider "all the circumstances.'"  *U.S. Steel*, 548 F.2d at 1235 (citing *NAACP*, 413 U.S. at 366).  When intervention is sought after a final judgment, the motion is "'ordinarily looked upon with a jaundiced eye.'"  *Id.*, quoting *McDonald v. E. J. Lavino Co.*, 430 F.2d 1065, 1072 (5th Cir. 1970).

---

[12] As a threshold, Rule 42 requires a timely motion to intervene.  Fed. R. Civ. P. 42(a); *U.S. Steel Corp.*, 548 F.2d at 1235.

[13] "A motion for reconsideration made after final judgment falls within the ambit of either [Federal Rule of Civil Procedure] 59(e) (motion to alter or amend a judgment) or Rule 60(b) (motion for relief from judgment or order)."  *Region 8 Forest Serv. Timber Purchases Council v. Alcock*, 993 F.2d 800, 806 n.5 (11th Cir. 1993) (citing *Inglese v. Warden*, 687 F.2d 362, 363 n.1 (11th Cir.1982) and *Woodham v. American Cystoscope Co.*, 335 F.2d 551, 554−55 (5th Cir. 1964)).  Rule 59 allows a party to move to alter or amend a judgment in a civil case. Fed. R. Civ. P. 59(e); *Serrano v. U.S.*, 411 Fed. Appx. 253, 254 (11th Cir. 2011) (citing Fed. R. Civ. P. 59(e)).  But, "a motion to alter or amend a judgment must be filed *no later than [twenty-eight] days* after the entry of the judgment." Fed. R. Civ. P. 59(e) (emphasis added).  Rule 60(b) allows a party to seek relief from a final judgment in a civil case for a number of reasons, including mistake, excusable neglect, newly discovered evidence, fraud, and any other reason that justifies relief. *Serrano*, 411 Fed. Appx. at 254 (citing Fed. R. Civ. P. 60(b)).  But Rule 60(c) provides that "[a] motion under Rule 60(b) must be made *within a reasonable time* ─ and for reasons (1), (2), and (3) *no more than one year after* the entry of the judgment or order or the date of the proceeding. Fed. R. Civ. P. 60(c) (emphasis added).

[14] Federal Rule of Appellate Procedure 4 provides that "[i]n a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district *clerk within 30 days* after entry of the judgment or order appealed from." (Emphasis added).  Rule 4(a)(1)(B) extends the time for filing a notice of appeal *to sixty (60) days* where one of the parties is the United States or a United States agency.

[15] Again, the timeline of these events renders the argument that the Director "had no way of knowing that her interests would be adversely affected" wholly disingenuous.  (Doc. # 33 at 7).

This is because "[i]nterventions after judgment have a strong tendency to prejudice existing parties to the litigation or to interfere substantially with the orderly process of the court." *Id.*

Here, the parties had differing motivations that led them to want to resolve the case, but they each relied on the fact that they reached a binding, final accord.  An express and material term of that compromise was that the TTAB's decision would be vacated.  Absent the parties agreeing to that term, there would not have been a deal.

The parties reached their settlement nearly two years ago.  After notifying the TTAB of their settlement and the Final Consent Judgment, that agency rested on its laurels.  Then after a year of inactivity, the TTAB said (in the inimitable words of ESPN Game Day's Lee Corso), "Not so fast."  This is truly ironic because the TTAB itself, was very slow in saying that, and even slower in seeking to intervene (through Lee) in this court.  As already noted, after the TTAB issued its decision ignoring the vacatur term of the final judgment, Lee did not ask to intervene when the motion to enforce this court's judgment was filed.   Likewise, she did not intervene at the time that this court invited the USPTO to be heard on the motion to enforce.  Rather, it was not until after the hearing on the motion to enforce that the belated motion was filed.  Lee is more than a day late.  The Director's Motion is untimely, and any right to intervene in this long-closed action has been waived.  *See U.S. Steel*, 548 F.2d at 1235.

"[W]aiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (citation and internal quotation marks omitted).  Waiver can be implied by conduct. *Cf. Edwards v. Allied Home Mortg. Capital Corp.*, 962 So.2d 194, 209 (Ala. 2007) ("A party's intent to waive a right may be found from conduct that is inconsistent with the assertion of that right.").   In this instance, the USPTO's monitoring of developments in these cases, the TTAB's year-long silence in the face of the court's final

judgment, and Lee's belated efforts to intervene at this late date, speak louder than the pretextual words offered to this court in its motion to intervene.  Rather than exercise its right to intervene in this tribunal, and, if necessary, appeal this court's order, the USPTO (through the TTAB) took it upon itself to conduct its own review of this court's order, and self-determine that it would not comply with the final judgment.  In doing so, it slumbered on its right to intervene for the purposes of either asking this court to change its decision or asking the Eleventh Circuit to review the final judgment.[16]  Actions have consequences.  So, too, does inaction.  Because the Director's Motion is untimely and the right to intervene has been waived, the Motion by Michelle K. Lee, Undersecretary for Intellectual Property and Director of the United States Patent and Trademark Office, to Intervene (Doc. # 28) is due to be denied.

## IV.    Conclusion

For the foregoing reasons, Plaintiffs' Motion to Enforce Consent Judgment (Doc. # 16) is due to be granted, and the Motion by Michelle K. Lee, Undersecretary for Intellectual Property and Director of the United States Patent and Trademark Office, to Intervene (Doc. # 28) is due to be denied.  A separate order will be entered.

**DONE** and **ORDERED** this February 23, 2016.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE

---

[16] As counsel candidly stated at oral argument, the TTAB's position is tainted with procedural irregularities.  (Doc. 22 at 41, 43).